MARC E. MAYER (SBN 190969)
  mem@msk.com
MARK C. HUMPHREY (SBN 291718)
  mxh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIOT GAMES, INC. and BUNGIE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CAMERON SANTOS d/b/a "GATORCHEATS," an individual, and Does 1 through 10, inclusive, <br><br> Defendants. | CASE NO. 2:21-cv-195 <br><br> **COMPLAINT FOR:** <br><br> **(1) TRAFFICKING IN CIRCUMVENTION DEVICES;** <br><br> **(2) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** <br><br> **(3) UNFAIR COMPETITION** <br><br> **Demand For Jury Trial** |

Riot Games, Inc. ("Riot") and Bungie, Inc. ("Bungie") (collectively "Plaintiffs") allege as follows:

## PRELIMINARY STATEMENT

1.     Riot and Bungie are the owners and publishers of two of the most popular online multiplayer video games in the world: "Valorant" and "Destiny 2" (collectively, the "Games").  By this lawsuit, Plaintiffs seek to put a stop to the unlawful, for-profit sale and distribution of malicious software products designed to enable members of the public to gain unfair competitive advantages (*i.e.*, to

cheat) in the Games, and, thereby, to impair and destroy Plaintiffs' Games, Plaintiffs' overall business, and the experience of Plaintiffs' player community.

2. Defendant Cameron Santos ("Defendant" or "Santos") is the owner and operator of several commercial online business ventures engaged in the development, sale, distribution, marketing, and exploitation of a portfolio of malicious cheats and hacks for popular multiplayer games, including the Games. Among the most prominent of these ventures is "GatorCheats," which largely operates via the website www.gatorcheats.com (the "GatorCheats Website"). Via the GatorCheats Website and other related websites and social media accounts, Defendant and those working in concert with him sell a Valorant cheat known as "Gatorant" and a suite of software cheats for Destiny 2 (the "Destiny 2 Cheats") (collectively, the "Cheating Software"). The Cheating Software enables players to manipulate Valorant and Destiny 2 to their personal advantage, such as by automatically aiming weapons, revealing the locations of opponents, and allowing the player to see a vast array of information that otherwise would be obscured.

3. Defendants' conduct has caused, and is continuing to cause, massive and irreparable harm to Plaintiffs and their business interests. The success of Plaintiffs' Games depends on them being enjoyable and fair for all players, and Plaintiffs spend an enormous amount of time and money to ensure that this is the case. Defendants' sale and distribution of the Cheating Software has caused Plaintiffs to suffer irreparable damage to their goodwill and reputation and to lose millions of dollars in revenue.

4. In creating, marketing, selling, servicing, and distributing the Cheating Software, Defendants have engaged in numerous unlawful acts under United States and California law. Defendants have violated Section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(b)(1), by selling, importing, offering, providing, and otherwise trafficking in technologies that circumvent or evade anti-cheat technologies used by Plaintiffs to protect the

integrity and commercial value of Valorant and Destiny 2.  Defendants also have knowingly, intentionally, and maliciously interfered with and disrupted the contracts Plaintiffs have with their customers in the United States, which explicitly prohibit the exact type of cheating that Defendants enable, encourage, and solicit by marketing and selling their Cheating Software.  Defendants not only know that their conduct is unlawful, but they engage in that conduct with the deliberate intent to harm Plaintiffs, their businesses, and their player community.  Plaintiffs are entitled to monetary damages, injunctive and other equitable relief, and punitive damages against Defendants.

## JURISDICTION AND VENUE

5.     This is a civil action seeking damages, injunctive relief, and other equitable relief under the anti-circumvention provisions of the DMCA, 17 U.S.C. § 1201, and the laws of the State of California.

6.     This Court has subject matter jurisdiction over Plaintiffs' claims for violating the anti-circumvention provisions of the DMCA pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims for intentional interference with contract and unfair competition, which are so related to Plaintiffs' federal claims as to be part of the same case or controversy.

7.     This Court has personal jurisdiction over Defendants because they have purposefully directed their activities at the United States, and at California in particular, have purposefully availed themselves of the benefits of doing business in California, and have established a continuing presence in California.  Plaintiffs are informed and believe, and on that basis allege, that, without limitation:

(a)     Defendants conduct extensive and ongoing business with users in the State of California;

Mitchell
Silberberg &
Knupp LLP

12724040.4

3

(b)     Defendants distribute the Cheating Software in the State of California, advertise and market the Cheating Software in the United States and the State of California, and communicate directly with users in the United States and in the State of California, including for the purposes of soliciting purchases of the Cheating Software by such users and providing technical support for the Cheating Software;

(c)     Defendants have entered into, and continue to enter into, contracts with individuals in the State of California, including contracts pursuant to which these individuals license from Defendants the right to install and use the Cheating Software.  In return for such licenses, Defendants receive ongoing recurring daily, weekly, or monthly payments from individuals in the United States and the State of California; and

(d)     Defendants contract with entities located in the State of California in connection with their businesses.  This includes, for example, domain name registries, hosting or content delivery services, as well as credit card processors and merchant banks.

(e)     Defendants engage in conduct that they know is likely to cause harm to Plaintiffs in the State of California, including in this District, where Riot is located and has its principal place of business.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is a judicial district in which a substantial part of the events giving rise to the claims occurred, and/or in which Plaintiffs' injury was suffered.

## **THE PARTIES**

9.     Riot is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Los Angeles, California.

10.     Bungie is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Bellevue, Washington.

11.     Plaintiffs are informed and believe, and on that basis allege, that Defendant Santos is an individual residing in Albuquerque, New Mexico. Plaintiffs are informed and believe, and on that basis allege, that Santos is the founder, owner, operator, and/or driving force of GatorCheats, is the owner and operator of the GatorCheats Website, and at times does business under other names, such as "Honeyhacks" and "Voidcheaters."  Under one or more of these business names, Santos markets, advertises, promotes, and otherwise facilitates the sale of the Cheating Software.

12.     Plaintiffs are informed and believe, and on that basis allege, that defendant Doe 1 a/k/a "Hal," Doe 2 a/k/a "Matt," and Doe 3 a/k/a "Megan" provide or previously provided customer support for GatorCheats customers (i.e., users of the Cheating Software) via various online chat and messaging platforms. In that role, these individuals communicate with Plaintiffs' customers in order to support and enable their use of the Cheating Software, and serve as liaison to, and/or themselves operate as, developers of the Cheating Software.  Among other activities, Hal, Matt, and Megan assist customers in operating the Cheating Software, give advice to customers as to how to avoid being caught or detected by Plaintiffs for using the Cheating Software, and communicate to users about updates and improvements to the Cheating Software.  The true names and capacities, whether individual, corporate, associate, or otherwise, of Hal, Matt, and Megan are unknown to Plaintiffs, which has therefore sued said defendants by such aliases and fictitious names.

13.     The true names and capacities, whether individual, corporate, associate, or otherwise, of the remaining Doe defendants are unknown to Plaintiffs, which have therefore sued said defendants by such aliases and fictitious names. These defendants include individuals whose real identities are not yet known to Plaintiffs, but who are acting in concert with one another, often under the guise of Internet aliases, in committing the unlawful acts alleged herein.  Among the Doe

Defendants are developers, resellers, technical support staff, and other individuals who have participated in the development, sale, and distribution of the Cheating Software.  Plaintiffs will seek leave to amend this complaint to state their true names and capacities once said defendants' identities and capacities are ascertained.  Plaintiffs are informed and believe, and on that basis allege, that all defendants sued herein are liable to Plaintiffs as a result of their participation in all or some of the acts set forth in this complaint.  (All of the aforementioned defendants, both the named defendants and the Doe defendants, are referred to herein collectively as "Defendants.")

14.    Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned in this complaint, each of the Defendants was the agent of each of the other Defendants and, in doing the things alleged in this complaint, was acting within the course and scope of such agency.

## FACTS APPLICABLE TO ALL CLAIMS
### Riot and Valorant

15.    Riot is the developer, owner, and distributor of the popular video game "Valorant."  Valorant is an online multiplayer game currently available on Windows-based personal computers.  Since its release, Valorant has received glowing reviews and has consistently ranked among the most popular games streaming on the live-streaming platform Twitch.  Valorant is offered on a "free-to-play" basis, meaning that there is no charge for players to download and play the game on their personal computers.

16.    Valorant is a team-based, tactical "first-person shooter" game that allows players to play as one of a set of "agents," pre-designed characters that possesses unique attributes, skills, weapons, and other abilities.  Players start each round with a pistol and a "charge" for one of their signature abilities.  Other weapons and charges are purchased using in-game currency (awarded based on the

1   outcomes of game rounds).  Weapons available to players include automatic and

2   semi-automatic guns that have shooting patterns a player must learn and master in

3   order to be able to use them properly and accurately.

4        17.     Valorant matches are intense and highly competitive affairs, with a

5   heavy emphasis on teamwork.  Teams that do not cohesively work together and

6   account for individual players' strengths and weaknesses have a very hard time

7   prevailing, particularly if they come up against a team of dedicated players that is

8   working together.  Since its release, Valorant has developed a robust and growing

9   player community, and is rapidly becoming one of the most important and popular

10  competitive "esports."  Valorant is played by casual players, serious amateurs, and

11  professional players, including in professional and semi-professional tournaments

12  around the world.

13

14                       **Bungie and Destiny 2**

15       18.     Bungie is the developer, owner, and distributor of the video game

16  titled "Destiny 2."  Destiny 2 is an online multiplayer "first-person shooter"

17  currently available on Windows-based personal computers, as well as home video

18  game consoles and the Google Stadia cloud gaming service.  Destiny 2 originally

19  was released on September 6, 2017, for the Sony Playstation 4 and Microsoft Xbox

20  One, and on October 24, 2017, for Windows computers.  Since the game's original

21  release, Bungie has released for sale multiple expansions or add-ons to the main

22  game experience, including, most recently, the "Beyond Light" expansion released

23  in November 2020.  These expansions typically offer players new quests, weapons,

24  game modes, and other additions or revisions to Destiny 2's core gameplay.

25       19.     Destiny 2 is an open, "shared-world" multiplayer, "first-person

26  shooter" game in which players can see and interact with one another.  The game

27  offers two main types of activities: player-versus-environment (PvE), in which

28  players cooperate to fight against computer-controlled opponents, and player-

Mitchell
Silberberg &
Knupp LLP

12724040.4

1   versus-player (PvP), in which players compete against one another.  Players

2   generally are free to complete activities in Destiny 2 on their own, or with a team

3   of friends (or people randomly assigned to them via matchmaking).  Some

4   activities, however, require players to team up with others, specifically three-player

5   "Strikes" and six-player "Raids," and some competitive PvP modes in which

6   players can obtain extremely rare items and other rewards.

7       20.    Matches played in Destiny 2's PvP modes are intense and highly

8   competitive affairs.  In Destiny 2, competition can be particularly intense due to

9   the presence of rare loot which can affect player progression, in addition to the

10   prestige of increasing one's rank and character power.  As a result, the demand for

11   software that gives players an unfair advantage in Destiny 2's PvP modes is

12   particularly high.

13       21.    Destiny 2's PvE modes can also become intense affairs because

14   players can obtain special physical merchandise if they earn certain in-game

15   "achievements" by completing very challenging content within specific

16   timeframes.  As such, many players take part in highly competitive "achievement

17   hunting" in the hope of obtaining those awards.  The idea that players could qualify

18   for these difficult-to-obtain awards by using cheat software, or that they are

19   progressing more rapidly in order to become competitive by using cheats, cheapens

20   the experience for legitimate players.

21

22                          **<u>Plaintiffs' Business Model</u>**

23       22.    Plaintiffs' success rests in large part on their ability to offer

24   consistently compelling player experiences so that customers remain invested in

25   the Games and play them for a sustained period of time.  Retaining and satisfying

26   their player communities is an acute concern for Plaintiffs because much of the

27   revenue Plaintiffs earn from their Games is from dedicated or long-term players

28   who enjoy the Games and wish to enhance their experience with the Games by

investing in "virtual goods" (such as new characters, new weapons, and cosmetic upgrades such as distinctive "skins" or clothing) or purchasing expansion packs that offer new facets to the game experience.

23.     Both Valorant and Destiny 2 are offered to the public for free.  Thus, in order to play the Games, a member of the public need only register an account with Plaintiffs, download the respective Game software, and connect to Plaintiffs' multiplayer servers.  Should a player wish to purchase optional in-game items, unlock new characters, or gain access to exclusive content, he or she may do so by purchasing in-game currency (known as "Valorant Points" in Valorant and "Silver" in Destiny 2.)  Additionally, Bungie creates and makes available for sale Destiny 2 "expansions," which offer new content and new game modes.

24.     The revenue from the sale of virtual currency and digital enhancements or expansions is what enables Plaintiffs to maintain, update, service, and develop the Games and their online services.  Accordingly, it is paramount to Plaintiffs' business models that the Games retain the interest of their respective user bases for sustained periods of time, so that players will remain dedicated to the Games, recommend the Games to friends and family, and continue to purchase virtual items and expansions.  A vital part of the player experience is the fairness and integrity of the Games, and thus Plaintiffs invest an enormous amount of time and money to ensure that all players stand on equal footing and have a fair chance of progressing in the Games.  If players perceive that others are cheating or have an unfair advantage, they will grow frustrated with the Games and stop playing. That, in turn, could disrupt and/or destroy the Games' player communities and severely harm Plaintiffs' ability to generate revenue and to maintain, improve, and expand the Games.

**Plaintiffs' Efforts To Protect Against Hackers And Cheaters**

25.     Because Valorant and Destiny 2 are such popular games, unscrupulous individuals and companies such as Defendants seek to exploit the games for their own personal gain and profit by selling cheats, hacks, and other malicious software, knowing that they are ruining the experience for other players and harming Plaintiffs.  For this reason, Plaintiffs undertake enormous effort to protect the integrity of the Games through both technical and contractual means.

Technical Protection

26.     In order to protect the Games from cheating or unauthorized exploitation, Plaintiffs employ a variety of anti-cheat technologies.  Riot, for example, uses a custom game security software called "Vanguard."  Vanguard is installed on a player's computer system when the Valorant game is installed. Vanguard is designed to detect, and effectively detects, when players are using software that allows them to cheat in the game and Vanguard prevents unauthorized access to Valorant by those players.  Bungie employs similar anti-cheat software with Destiny 2.  It is not possible to play the Games without installing Plaintiffs' anti-cheat technologies.

27.     Because both Plaintiffs employ effective anti-cheat technologies, in order for any hack or cheat software to operate, it must be designed to prevent or avoid detection by the anti-cheat software, such as by concealing itself or by disabling the anti-cheat technology.  Otherwise, the cheat will be detected and the user will be denied access to the Games.

Contractual Protection

28.     In order to access, download, or play the Games, users must create and register accounts with Riot or Bungie.  Upon downloading the Games and beginning installation, users must expressly manifest their assent to Riot's Terms

Mitchell
Silberberg &
Knupp LLP
12724040.4

of Service (collectively, the "TOS") or to Bungie's Limited Software License Agreement ("SLA").[1]  The entire text of the License Agreements is displayed to each user at the time that player first accesses his or her Riot or Bungie account while installing the Games; in the case of Valorant, the installation pauses and will not progress until the user assents to the TOS.  If the user refuses to consent to the License Agreements, installation halts and the programs immediately close.  Riot's TOS is available in its entirety online at riotgames.com/en/terms-of-service, while Bungie's SLA is available at bungie.net/7/en/Legal/SLA.

29.     Riot's TOS includes a limited license agreement between Riot and its users.  Under the TOS, Riot grants to users a limited license to use and enjoy its services and games for "individual, non-commercial, entertainment purposes only," expressly conditioned upon the user's compliance with the TOS.  Among other provisions, the TOS expressly prohibits players from "[u]sing any unauthorized third party programs, including mods, hacks, cheats, scripts, bots, trainers and automation programs that interact with [Valorant] in any way, for any purpose," or from "[a]voiding, bypassing, removing, deactivating, impairing, descrambling or otherwise circumventing any technological measure implemented by Riot or any third party to protect [Valorant]."

30.     Bungie's SLA also includes a limited license agreement between Bungie and its users.  Under the SLA, users are required to agree not to, among other things, "hack or modify [Destiny 2], or create, develop, modify, distribute, or use any unauthorized software programs to gain advantage in any online or multiplayer game modes."  Users also are required to agree not to "receive or provide 'boosting services,' to advance progress or achieve results that are not solely based on the account holder's gameplay."

---

[1] Riot's TOS and Bungie's SLA are at times referred to collectively herein as the "License Agreements."

Mitchell
Silberberg &
Knupp LLP

12724040.4

31.     The Games are made available to the public exclusively through Plaintiffs' proprietary servers and matchmaking systems.  Thus, it is not possible for a user to lawfully obtain access to or play the Games without expressly consenting to the License Agreements.

## Defendants And Their Unlawful Conduct

32.     Plaintiffs are informed and believe, and on that basis allege, that Defendants are engaged in developing, updating, marketing, distributing, selling, and supporting cheating software, including Gatorant and the Destiny 2 Cheats.  At all times relevant herein, Defendants have developed, updated, marketed, distributed, sold, and supported the Cheating Software.  They have done so, and continue to do so, via the GatorCheats Website, email, and communication platforms such as the instant messaging service "Telegram" and, at one time, the online "chat room" system known as "Discord."

33.     The GatorCheats Website claims that it is "the best website for safe and secure video game cheats," that it sells "high quality cheats and services for the most popular games on the market," and that it is "the only provider on the web who will do [the customer's] personal service without any chance of ban." GatorCheats also openly states that its "mission is to help people who do not have time to gain skill on video games legitimately but still want to find enjoyment playing video games regardless."

34.     Additionally, according to the GatorCheats Website, GatorCheats' products and services:

- Are "known to launch first and remain undetected the longest."
- "[H]ave the best uptime out of any provider in this market."
- "[H]ave auto update functionalities that cover most all game updates, so you can keep cheating as it should be!"

Mitchell
Silberberg &
Knupp LLP

12724040.4

12

35.     Plaintiffs are informed and believe, and on that basis allege, that in addition to marketing and distributing cheats (including but not limited to the Cheating Software), Defendants provide extensive and ongoing customer support and technical assistance.  The GatorCheats Website advertises such services, which Plaintiffs are informed and believe, and on that basis allege, are provided via GatorCheats' private communications with users via email, Telegram, and, previously, Discord.

<u>Gatorant</u>

36.     Among the products currently offered for sale by GatorCheats is "Gatorant," a cheat designed to be used with Valorant.  According to the GatorCheats Website, Gatorant injects a menu into Valorant (via GatorCheats' "most secure loader to date") that purports to enable Valorant players to cheat in the game by, *inter alia*, automatically aiming a player's weapon, expanding a player's field of vision, illuminating opponents, and displaying information such as the locations and health status of hidden or obscured opponents or the location of valuable items.

37.     Defendants specifically advertise Gatorant as being "undetected" by, and "secure" from Vanguard.  For example, Santos has posted the following on the GatorCheats Website:

> GATORANT, created by GatorCheats.  Purchase one month of my undetected, all in one, cheat and spoofer for Valorant.  My cheat is a menu injected via my most secure loader to date.  My menu is compatible with Windows 10, any processor, and any GPU.  My menu includes a very powerful and customizable aimbot with aim key, visibility checks, aim at enemies, aim at friends, aim bone selection, smoothness customization, recoil control, and FOV customization (please visit F.A.Q. for the full feature list, more details, and media).  My menu also includes flawless ESP: show enemies, show friends,

FOV drawing toggle, show names, show boxes, show bones, show health, and show equipment (please visit F.A.Q. for the full feature list, more details, and media).

38.     Access to Gatorant is offered for sale on the GatorCheats Website at the following rates: one month of access for $90.00, three months for $250.00, and lifetime (of the cheat) for $500.00.  GatorCheats also offers an "upgrade" to users with the three-month subscription to the lifetime tier, for an additional payment of $200.00.

39.     Riot is informed and believes, and on that basis alleges, that Gatorant has been downloaded and used by Valorant players thousands of times, including by players residing in the United States.  Riot also is informed and believes that Defendants have made tens or hundreds of thousands of dollars from their distribution and sale of Gatorant.

<u>The Destiny 2 Cheats</u>

40.     Until recently, Defendants publicly offered for sale on the GatorCheats Website a suite of software cheats designed to be used with Destiny 2. These cheats were advertised as "the best Destiny 2 cheat that money can buy" (the "Destiny 2 Cheats").  According to the GatorCheats Website, the Destiny 2 Cheats were accessible via "a menu injected via [GatorCheats'] secure loader" that included a "powerful and customizable aimbot," "flawless ESP," and a vast number of other features.

41.     Access to the Destiny 2 Cheats was offered for sale on the GatorCheats website at the following rates: three months of access for $100.00 and lifetime (of the cheat) for $200.00.  GatorCheats also offered an "upgrade" to users with the three-month subscription to the "lifetime" tier, for an additional payment of $115.00.

42.     Bungie is informed and believes, and on that basis alleges, that the

Destiny 2 Cheats were downloaded and used by Destiny 2 players thousands of times, including by players residing in the United States.  Bungie also is informed and believes that Defendants have made tens or hundreds of thousands of dollars from their distribution and sale of the Destiny 2 Cheats.

43.    On November 11, 2020, Bungie's legal counsel served defendant Santos, GatorCheats' principal, with a cease and desist letter regarding the Destiny 2 Cheats.  On November 14, 2020, Santos notified GatorCheats users on Telegram that he had received the letter from Bungie, and that he would be removing the Destiny 2 Cheats within the timeframe specified in the letter.  Shortly after sending this message, however, he stated through Telegram that he would be continuing to support the Destiny 2 Cheats for users who already had purchased a license:

> I am getting a lot of angry messages so I'm just going to spell it out.  I am not going to stop support for the D2 cheat.  I am just going to stop selling it.  So if you are a lifetime user, you should have no grievance to settle with me.

44.    On or around November 18, 2020, the Destiny 2 Cheats were removed from public-facing pages of the GatorCheats Website.  However, Plaintiffs are informed and believe, and on that basis allege, that Defendants continue to offer the Destiny 2 Cheats, or some derivation thereof, for sale in a "private" section of the GatorCheats Website open to members of the public that inquire about certain software products.  Moreover, despite the public removal of the Destiny 2 Cheats from the GatorCheats Website, information about the Destiny 2 Cheats remained accessible on the GatorCheats Website for weeks thereafter.  Plaintiffs also are informed and believe, and on that basis allege, that Defendants continue to support the Destiny 2 Cheats (and other cheating software that has been removed from public-facing pages of the GatorCheats Website) for players that previously purchased that software.

**Defendants' Unlawful Activities**

45.     Plaintiffs are informed and believe, and on that basis allege, that in order for the Cheating Software to operate with the Games, the Cheating Software necessarily includes technology that primarily is designed to avoid, bypass, evade, or otherwise circumvent Plaintiffs' anti-cheat technologies, including in particular Riot's Vanguard anti-cheat technology.  Accordingly, each time Defendants sell a license to the Cheating Software they are trafficking in technology that controls access to the Games.

46.     Defendants specifically and aggressively advertise and promote the Cheating Software as having been designed to circumvent Plaintiffs' anti-cheat software.  For example, on the GatorCheats website, Santos touts that among the "features" of Gatorant is GatorCheats' "fully functional Vanguard HWID [hardware ID] spoofer," which allows players that have been "banned" from (i.e., permanently denied access to) Valorant to continue to play the Game.

47.     Each time a player uses the Cheating Software to cheat in the Games, he or she also violates Plaintiffs' License Agreements, including those provisions that specifically prohibit players from "[u]sing any unauthorized third party programs, including mods, hacks, cheats, scripts, bots, trainers and automation programs that interact with [Valorant] in any way, for any purpose," and from "hack[ing] or modify[ing] [Destiny 2], or creat[ing], develop[ing], modify[ing], distribut[ing], or [using] any unauthorized software programs to gain advantage in any online or multiplayer game modes."  Accordingly, Plaintiffs are informed and believe, and on that basis allege, that as a result of Defendants' conduct, thousands or tens of thousands of breaches of these contracts have occurred.

48.     Plaintiffs are informed and believe, and on that basis allege, that Defendants are fully aware that the use of the Cheating Software violates the License Agreements.  For example, the GatorCheats Website repeatedly assures users that its cheats are undetected, and that users will not be at risk of being

banned from the Games.  The GatorCheats Website also contains "Terms & Conditions" which acknowledge that GatorCheats software "can be used to alter Copyrighted [sic] code" and warn, among other things, that using GatorCheats software "may violate terms or codes laid out by external individuals or entities." *See* gatorcheats.com/terms.

49.    The Cheating Software has no purpose or function other than to enable players to violate the License Agreements by using cheats and exploits. Thus, Defendants' goal is to ensure that their customers continue to receive the benefits of their contracts with Plaintiffs while they simultaneously engage in continuing breaches of their obligations under these contracts.

50.    By their conduct, Defendants have caused and continue to cause serious harm to the Games and to Plaintiffs.  Such harm is immediate, massive and irreparable, and includes (but is not limited to) the following:

(a)    Defendants irreparably harm the ability of Plaintiffs' legitimate customers to enjoy and participate in the online experiences carefully created by Plaintiffs.  That, in turn, causes users to grow dissatisfied with the Games, lose interest, and stop playing.

(b)    Defendants' conduct has forced Plaintiffs to spend enormous sums of money (and vast amounts of time) attempting to remediate the damage caused by the Cheating Software.  This includes creating and releasing new versions of the Games that counteract the Cheating Software, responding to player complaints, employing personnel to police the games to detect the use of the Cheating Software, and "banning" (*i.e.*, permanently deleting the accounts of) users who are using the Cheating Software.

(c)    Defendants' conduct harms Plaintiffs' reputation and results in the loss of significant customer goodwill.

51.    Defendants' conduct has resulted in damage to Plaintiffs in an amount to be proven at trial.  By Plaintiffs' estimation, such damage may amount to

1   millions of dollars.  Unless and until Defendants are preliminarily or permanently

2   enjoined, Plaintiffs will continue to suffer severe harm from the Cheating

3   Software.

4

5   ### COUNT I

6   ### Trafficking In Circumvention Devices

7       52.    Plaintiffs re-allege and incorporate by reference the allegations in

8   paragraphs 1 through 51, as if set forth fully herein.

9       53.    The Games, including but not limited to their source code and

10  audiovisual game play environments, are copyrighted works.

11      54.    Plaintiffs have incorporated into the Games technological measures

12  that effectively control access to the Games, including access to the dynamic

13  audiovisual elements that comprise the game.

14      55.    The Cheating Software is comprised of or contains technologies,

15  products, services, devices, components, or parts thereof that primarily are

16  designed or produced for the purpose of circumventing technological measures that

17  effectively control access to the Games.

18      56.    The Cheating Software (and the portions thereof that circumvent

19  Plaintiffs' anti-cheat technologies) have no commercially significant purpose or

20  use other than to circumvent a technological measure that effectively controls

21  access to a copyrighted work and that protects the exclusive rights of a copyright

22  owner.

23      57.    Defendants market the Cheating Software in the United States with

24  knowledge of their use to circumvent Plaintiffs' technological access controls.

25      58.    As a result of the foregoing, Defendants are offering to the public,

26  providing, importing, or otherwise trafficking in technology that violates 17 U.S.C.

27  § 1201(a)(2).

28

Mitchell
Silberberg &
Knupp LLP

12724040.4

59.     Defendants' acts constituting DMCA violations have been and continue to be performed without the permission, authorization, or consent of Plaintiffs.

60.     Defendants have violated Section 1201 of the DMCA willfully and for private commercial gain.

61.     Defendants' conduct has caused damage to Plaintiffs and has unjustly enriched Defendants, in an amount to be proven at trial.

62.     As a result of Defendants' acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Plaintiffs are informed and believe, and on that basis allege, that, unless enjoined and restrained by this Court, Defendants will continue to violate Section 1201 of the DMCA.  Plaintiffs are entitled to injunctive relief to restrain and enjoin Defendants' continuing unlawful conduct.

63.     As a direct and proximate result of Defendants' conduct, pursuant to 17 U.S.C. § 1203(c), Plaintiffs are entitled to Defendants' profits attributable to their violations of 17 U.S.C § 1201.

64.     Alternatively, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(A), in the amount of $2,500 with respect to each violation by Defendants.

65.     Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 1203(b).

## COUNT II

### Intentional Interference With Contractual Relations

66.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 65, as if set forth fully herein.

67.     As described herein, in order to install and play the Games, licensed users in the United States first must assent to Plaintiffs' respective License Agreements.

68.     Plaintiffs' contracts with their users are valid and enforceable.

69.     Each time a purchaser of the Cheating Software uses the Cheating Software in connection with the Games, he or she breaches the License Agreements.  Plaintiffs are informed and believe, and on that basis allege, that thousands of such breaches have taken place by Defendants' customers.

70.     Plaintiffs are informed and believe, and on that basis allege, that Defendants are aware of both the existence and specific relevant terms of contracts between Plaintiffs and their users in the United States, including the License Agreements.  Specifically, Defendants are aware that the License Agreements prohibit players from using the Cheating Software and that players are at risk of being banned from the Games should they be caught using the Cheating Software. Nevertheless, Defendants intentionally encourage and induce users of the Games to purchase and use the Cheating Software, knowing that the use of these products by their customers is a breach of these customers' contracts with Plaintiffs.

71.     By inducing Plaintiffs' users to breach their contracts with Plaintiffs, Defendants have intentionally interfered, and continue to interfere, with the contracts between Plaintiffs and their users.

72.     As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damage in an amount to be proven at trial, including but not limited to a loss of goodwill among users of the Plaintiffs' games, diversion of Plaintiffs' resources to attempt to detect and prevent the use of the Cheating Software, decreased profits, and a loss of profits from users whose accounts Plaintiffs have terminated for violation of the License Agreements in the United States.

73.     As a further result of Defendants' actions, Defendants have unjustly obtained specifically identifiable property, consisting of all of the proceeds

Mitchell
Silberberg &
Knupp LLP

12724040.4

20

attributable to the sale of the Cheating Software in the United States, and any other products or services that violate any of Plaintiffs' rights, and any additional property traceable to those proceeds.  Those proceeds, which are directly attributable to Defendants' manipulation and misuse of the Games and intentional interference with Plaintiffs' contracts, rightfully and equitably belong to Plaintiffs.

74.     Defendants' intentional interference with the contracts between Plaintiffs and their licensed users in the United States entitles Plaintiffs to injunctive relief and compensatory damages, the imposition of a constructive trust over Defendants' wrongfully obtained proceeds, and other available relief.

75.     Defendants are guilty of oppression, fraud, or malice, and Plaintiffs, in addition to their actual damages, by reason thereof, are entitled to recover exemplary and punitive damages against Defendants.

## COUNT III
### Unfair Competition

76.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 75, as if set forth fully herein.

77.     The acts and conduct of Defendants constitute unfair competition in the United States under California Business & Professions Code § 17200 *et seq.* and under California common law.

78.     As a direct and proximate result of Defendants' unfair competition in the United States, Plaintiffs have been damaged, and Defendants have been unjustly enriched, in an amount to be proven at trial for which damages and/or restitution and disgorgement is appropriate.  Such damages and/or restitution and disgorgement should include a declaration by this Court that Defendants are constructive trustees for the benefit of Plaintiffs, and an order that Defendants convey to Plaintiffs the gross receipts received or to be received that are attributable to the sale of the Cheating Software in the United States.

Mitchell
Silberberg &
Knupp LLP

12724040.4

21

79.     Defendants are guilty of oppression, fraud or malice, and Plaintiffs, in addition to their actual damages, by reason thereof, are entitled to recover exemplary and punitive damages against Defendants.

80.     As a result of Defendants' acts and conduct in the United States, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Plaintiffs are informed and believe, and on that basis allege, that unless enjoined and restrained by this Court, Defendants will continue to engage in unfair competition.  Pursuant to California Business & Professions Code § 17203, Plaintiffs are entitled to temporary, preliminary and permanent injunctions prohibiting further acts of unfair competition.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor on each and every claim for relief set forth above and award them relief, including but not limited to an order:

1.      Preliminarily and permanently enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all persons acting in concert or participation with Defendants from: (i) trafficking in circumvention devices in the United States; (ii) inducing, contributing to, or facilitating third-party infringements of Plaintiffs' copyrighted works in the United States; (iii) intentionally interfering with Plaintiffs' contracts with players in the United States; and (iv) engaging in unfair competition in the United States.

2.      Requiring Defendants to shut down the Cheating Software and any colorable copies thereof, hosted at any domain, address, location, or ISP.

3.      Requiring Defendants to deliver to Plaintiffs all copies of materials that infringe or violate any of Plaintiffs' rights, as described herein.

4.     Requiring Defendants to provide Plaintiffs with an accounting of any and all sales of products or services in the United States that infringe or violate any of Plaintiffs' rights, as described herein.

5.     Awarding Plaintiffs actual or maximum statutory damages for violation of Section 1201 of the DMCA, as appropriate, pursuant to 17 U.S.C. § 1203(c).

6.     Awarding Plaintiffs their full costs and attorneys' fees in this action pursuant to 17 U.S.C. § 1203(b) and other applicable laws.

7.     Awarding Plaintiffs exemplary and punitive damages against Defendants on Plaintiffs' cause of action for intentional interference with contractual relations.

8.     Awarding Plaintiffs restitution of Defendants' unlawful proceeds, including an accounting of any and all sales of the Cheating Software in the United States, and/or any other products or services that violate any of Plaintiffs' rights described herein.

9.     Imposing a constructive trust over the proceeds unjustly obtained by Defendants through the sales of the Cheating Software in the United States, and/or any other products or services that violate any of Plaintiffs' rights described herein.

10.     Awarding such other and further relief as this Court may deem just and appropriate.


DATED:  January 8, 2021              MARC E. MAYER
                                     MARK C. HUMPHREY
                                     MITCHELL SILBERBERG & KNUPP LLP


                                     By:   /s/ *Marc E. Mayer*
                                           Marc E. Mayer
                                           Attorneys for Plaintiffs

Mitchell
Silberberg &
Knupp LLP

12724040.4

23

1

## **<u>JURY DEMAND</u>**

2

Plaintiffs demand a trial by jury on all issues so triable.

3

4

DATED:  January 8, 2021

MARC E. MAYER
MARK C. HUMPHREY
MITCHELL SILBERBERG & KNUPP LLP

5

6

By:   /s/ *Marc E. Mayer*

7

Marc E. Mayer
Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

12724040.4

24